# EXHIBIT "1"

1  FRANK N. DARRAS #128904, Frank@DarrasLaw.com
   SUSAN B. GRABARSKY #203004, SGrabarsky@DarrasLaw.com
2  PHILLIP S. BATHER #273236, PBather@DarrasLaw.com
3  **⫐ DarrasLaw**
4  3257 East Guasti Road, Suite 300
   Ontario, California 91761-1227
5  Telephone:   (909) 390-3770
   Facsimile:   (909) 974-2121
6
7  Attorneys for Plaintiff
   BRIAN GWARTZ, M.D.
8
9
10           SUPERIOR COURT OF THE STATE OF CALIFORNIA
11                    FOR THE COUNTY OF ORANGE
12
13  BRIAN GWARTZ, M.D.,                    Case No:   30-2020-01151712-CU-IC-CXC
14              Plaintiff,                 **COMPLAINT AND JURY DEMAND**
15       vs.                              1) Breach of the Duty of Good Faith and
                                              Fair Dealing;
16                                        2) Breach of Contract; and,
    THOSE CERTAIN UNDERWRITERS AT         3) Financial Elder Abuse
17  LLOYD'S LONDON SUBSCRIBING TO
    POLICY NO. RCA43715082A-004; and
18  DOES 1 through 10, inclusive,
19
                Defendants,
20                                         Assigned for All Purposes
21                                         Judge Glenda Sanders
22  Plaintiff alleges as follows:                CX-101
23                    **GENERAL ALLEGATIONS**
24                        <u>**Introduction**</u>
25       1.     Defendant, THOSE CERTAIN UNDERWRITERS AT LLOYD'S LONDON
26  SUBSCRIBING TO POLICY NO. RCA43715082A-004 ("LLOYD'S"), reassures its
27  policyholders that they can have "Confidence" in the company, as "Lloyd's core
28  / / /

1   business is to protect from disaster, and the fast and fair payment of claims."[1]

2        2.      Plaintiff, BRIAN GWARTZ, M.D. ("DR. GWARTZ" or "Plaintiff"), a board-

3   certified anesthesiologist, had a successful practice as a physician and surgeon

4   specializing in Pain Management, when he sought the financial security of an individual

5   disability insurance policy from LLOYD'S.  Based upon its reputation in the insurance

6   industry, Plaintiff put his trust and his family's financial well-being in the hands of

7   LLOYD'S, to ensure that he would be protected in the unlikely event of his disability.

8        3.      Plaintiff timely and fully paid premiums to LLOYD'S, fulfilling in good faith

9   all of his contractual obligations under his individual disability insurance policy.

10       4.      Unfortunately, in May 2019, while performing surgery, Plaintiff began

11  having sharp pain in the right low back radiating up and down the spine associated with

12  muscle spasms.  He promptly consulted with his treating physician.  Orthopedic

13  Surgeon, Mark Spoonamore, M.D. ("Dr. Spoonamore"), ordered MRI scans which

14  revealed an unexpectedly devastating condition: a tumor on his spine, in addition to

15  severe degenerative disk disease and Scheuermann kyphosis, causing intractable

16  thoracolumbar pain. In his May 22, 2019, Initial Consultation report, Dr. Spoonamore

17  wrote, "The patient is completely incapacitated. We have placed him on total disability."

18  Plaintiff never performed another procedure or returned to work as an anesthesiologist

19  thereafter.

20       5.      Dr. Spoonamore certified Plaintiff totally and permanently disabled, as

21  defined in Plaintiff's LLOYD'S policy, as of May 22, 2019.  Specifically, Dr. Spoonamore

22  responded on the disability claim form provided by LLOYD'S: "6. (A) How long was or

23  will patient by totally disabled (Unable to work?) – From: 5/22/19 Thru: Forever."  In

24  addition, Dr. Spoonamore handwrote, "Pt is Permanently Disabled."

25       6.      Plaintiff filed a claim for disability benefits, expecting LLOYD'S to live up

26  to its promise of "fast and fair payment of claims."[2]  But an entire year after notifying

27  _____

28  [1] LLOYD'S, *Why policyholders buy insurance from Lloyd's*, https://www.lloyds.com/policyholder (July 15, 2020).
    [2] *Id.*

1    LLOYD'S of his total and permanent disability claim and fully cooperating with its

2    investigation, LLOYD'S still refuses to pay Plaintiff's claim.

3         7.    Although LLOYD'S had notice of Plaintiff's disability in June 2019 and

4    obtained Plaintiff's medical records in September 2019, LLOYD'S waited until April

5    2020, during the COVID-19 pandemic, to demand Plaintiff's in-person attendance at an

6    Independent Medical Examination.  On June 12, 2020, LLOYD'S wrote to Plaintiff

7    stating, "Failure of a claimant to cooperate with Us in the administration of a claim may

8    result in the termination of a claim…" and "We, at Our expense, have the right to have

9    the Insured examined by a Physician of Our choice as often as reasonably necessary

10   while a claim is pending."  Plaintiff, who is in a high-risk group for COVID-19 due to his

11   age and disabilities, suffered fear, anxiety, and emotional distress, as he was compelled

12   to attend LLOYD'S Independent Medical Examination in person on June 17, 2020.

13        8.    LLOYD'S had the privilege, opportunity, and means to conduct the

14   Independent Medical Examination prior to the beginning of the global pandemic, yet

15   failed to do so.  As a result of LLOYD'S unreasonable delay in investigating his claim,

16   Plaintiff was required to risk his health, safety, and life in order to attend LLOYD'S

17   Independent Medical Examination.

18        9.    Adding insult to injury, LLOYD'S billed Plaintiff for $32,360.32 in

19   additional premiums due on November 1, 2019.  The Policy provides for waiver of

20   premiums during disability, which LLOYD'S had notice of in Plaintiff's case several

21   months before the additional premiums were billed.

22        10.   To date, LLOYD'S refuses to produce the Independent Medical

23   Examination report, refund the premiums waived under the Policy, or pay the Plaintiff's

24   disability claim.

25                          **The Parties**

26        11.   Plaintiff, BRIAN GWARTZ, M.D., is, and at all relevant times was, a

27   resident and citizen of the State of California.

28        12.   Plaintiff alleges upon information and belief that Defendant, THOSE

1  CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO.

2  RCA43715082A-004, is, and at all relevant times was, the subject of a foreign state with

3  a principal place of business in London, England, who are authorized to transact and

4  are transacting the business of insurance in this state.

5       13.    The true names and capacities, whether individual, corporate, associate,

6  or otherwise, of Defendants, DOES 1 through 10, inclusive, are unknown to Plaintiff,

7  who therefore sues said Defendants by such fictitious names. Plaintiff is informed and

8  believes and on such information and belief alleges that each of the Defendants sued

9  herein as a DOE is legally responsible in some manner for the events and happenings

10  referred to herein, and will ask leave of this court to amend this Complaint to insert their

11  true names and capacities in place and instead of the fictitious names when the same

12  become known to Plaintiff.

13       14.    At all relevant times, Defendants, and each of them, were the agents and

14  employees of each of the remaining Defendants, and were at all times acting within the

15  purpose and scope of said agency and employment, and each Defendant has ratified

16  and approved the acts of his or her agent.

17                        **The Policy**

18       15.    Based upon information and belief, Plaintiff alleges that on or about

19  November 1, 2015, LLOYD'S issued policy number RCA43715082A-004 (the "Policy")

20  to Plaintiff. A copy of the Policy is attached hereto as Exhibit "A."

21       16.    The Policy provides a one-time, lump sum benefit of $3,000,000 following

22  a 12-month Elimination Period for permanent and total disability.  In addition, the Policy

23  provides a Waiver of Premium benefit once the insured becomes disabled.  The Policy

24  states, "In the event the Insured qualifies for benefits under this policy, any premium

25  installments due while the Insured is disabled and receiving benefits will be waived."

26       17.    The Policy defines disability as follows: "'PERMANENTLY AND

27  TOTALLY DISABLED' means, as a result of a covered Injury or Sickness, the Insured is

28  permanently and totally unable to perform the substantial and material duties of his or

DarrasLaw

1     her regular occupation as shown on the Schedule for the entire Elimination Period and

2     is not expected to recover for the remainder of his or her life. The Insured must also be

3     under the regular care of a Physician that is appropriate for the condition causing the

4     disability. No benefit will be paid prior to the completion of the Elimination Period."

5         18.     The Policy states, "ELIMINATION PERIOD means the period of time

6     shown on the Schedule during which the Insured must be continuously disabled before

7     benefits may be payable."

8         19.     The Policy provides, "TIME OF PAYMENT OF CLAIM. All benefits

9     payable under this Certificate for any loss will be paid in accordance with the Schedule

10    upon receipt of due written proof of loss."

11        20.     The Policy includes an "Arbitration Clause" which is ambiguous,

12    unconscionable, contrary to other provisions in the policy, contrary to law, and

13    unenforceable.  The Policy states:

14            ARBITRATION CLAUSE: As part of the proof of Permanent Total

15            Disability there must be included a certification from a physician that the

16            Insured Person has suffered Permanent Total Disability as defined in the

17            Certificate. In the event that Underwriters determine that it has not been

18            demonstrated the Insured Person is Permanently Totally Disabled, then

19            the question of Permanent Total Disability will be subject to the approval

20            of two independent referees.

21            One referee shall be an independent legally qualified physician* or

22            surgeon, chosen by the Underwriters and the second referee shall be an

23            independent expert of recognised standing in the occupation (as stated in

24            the Schedule) of the Insured Person, and shall be chosen by the Assured.

25            The referees shall have the authority to decide solely whether the Insured

26            Person's Total Disability is Permanent as defined in this Certificate. The

27            referees are not to decide any other aspect concerning the validity of the

28            claim. The decision of the two referees will be binding upon all parties.

1    In the event that the two referees fail to agree, then they will appoint an

2    Umpire (determined and agreed to by both parties prior to commencement

3    of the arbitration procedure) whose decision will be final and binding upon

4    all parties.

5    Any physicians, medical advisors and/or use of referees and umpire shall

6    be domiciled in the country where the certificate was issued.

7    Each party shall be responsible for their own respective costs, except for

8    those incurred as a result of the involvement of the final umpire where

9    additional costs shall be shared equally.

10    *Physician means a legally qualified physician or surgeon other than a

11    physician or surgeon who is related to the Insured Person by blood or

12    marriage.

13    21.    To the extent that the Policy's "Arbitration Clause" is enforceable, Plaintiff

14    has fully complied with the requirements thereof, in that he has: (a) provided LLOYD'S

15    with certification from a physician that he has suffered Permanent Total Disability as

16    defined in the Policy; and (b) despite fear, anxiety, and emotional distress due to his

17    high-risk for COVID-19, personally attended LLOYD'S Independent Medical

18    Examination on or about June 17, 2020.  To date, LLOYD'S has neither approved his

19    claim, nor demanded Plaintiff take any further action in pursuant to the "Arbitration

20    Clause."

21    22.    The Policy provides for, "CONFORMITY WITH STATE LAW. Any

22    provision of this Certificate that, on its Effective Date, is in conflict with the laws of the

23    state of the Owner on that date, shall be deemed amended to conform to the minimum

24    requirements of such laws."  Plaintiff is a California resident and the Policy was issued

25    in the State of California.

26    **Factual Allegations**

27    23.    Prior to his disability, Plaintiff worked as a physician, board certified in

28    anesthesiology, specializing in pain management.  His occupational duties include

- 6 -

DarrasLaw

1  operating on patients for placement of bionic devices, performing injection procedures,

2  and providing office-based pain management care.  Plaintiff's occupation is both

3  physically- and cognitively-demanding, requiring long periods of standing and sitting,

4  walking, bending over patients, bilateral upper extremity strength and dexterity, as well

5  as constant attention to detail, concentration, and focus.

6      24.      On or about May 16, 2019, during surgery, Plaintiff experienced a sharp

7  pain in his back, with radiating spinal pain and muscle spasms.  He promptly sought

8  medical attention.  That surgery was the last Plaintiff ever performed.

9      25.      On or about May 22, 2019, Orthopedic Surgeon Dr. Spoonamore

10  documented in his Initial Consultation report, "[Plaintiff] can barely function."  Based on

11  thoracic and lumbar MRI scans, Dr. Spoonamore diagnosed Plaintiff with: "1. Right T12

12  paravertebral cancerous mass. 2. Thoracic degenerative disk disease / Scheuermann

13  disease / Scheuermann kyphosis. 3. Intractable thoracolumbar pain."  On that day, Dr.

14  Spoonamore certified, "The patient is completely incapacitated. We have placed him on

15  total disability."

16      26.      On or about June 7, 2019, Plaintiff underwent thoracic surgery for

17  removal of the tumor from his spine by Anthony Kim, M.D. ("Dr. Kim").  Unfortunately,

18  the tumor removal did not relieve his severe pain due to the presence of severe

19  discogenic disease in the thoracic and lumbar spine with stenosis and radiculopathy.

20  Despite post-operative rehabilitation and physical therapy, Plaintiff is not able to sit or

21  stand for longer than 30 minutes without pain.  Post-operatively, he also developed

22  intermittent muscle spasms and shaking in his upper extremities, which make it

23  impossible for him to safely perform surgery, inject patients, or practice office-based

24  pain management.  On December 1, 2019, Dr. Kim noted Plaintiff's continuing pain and

25  spasms, and documented: "I was able to palpate ongoing muscle spasms… I believe

26  that the symptoms he is enduring are limiting him in his ability to function in his usual

27  manner."

28      27.      In June 2019, Plaintiff informed LLOYD'S that he was filing a permanent

1    and total disability claim under the Policy.  LLOYD's provided Plaintiff with its disability

2    claim forms and an Authorization to Disclose Health Information form, both of which

3    Plaintiff signed and dated on or about June 12, 2019.

4         28.    On or about June 24, 2019, Dr. Spoonamore certified that Plaintiff

5    remains totally disabled.  In the follow-up consultation report from that date, Dr.

6    Spoonamore documented Plaintiff's antalgic gait, decreased range of motion, and

7    persistent pain with moderate tenderness of the lumbar and thoracic spine.

8         29.    On or about August 26, 2019, Dr. Spoonamore responded to the

9    disability claim form provided by LLOYD'S: "6. (A) How long was or will patient by totally

10   disabled (Unable to work?) – From: 5/22/19 Thru: Forever."  In addition, Dr.

11   Spoonamore handwrote, "Pt is Permanently Disabled."  In so doing, consistent with his

12   initial consultation report dated May 22, 2019, Dr. Spoonamore certified Plaintiff totally

13   and permanently disabled as of May 22, 2019, as defined in Plaintiff's LLOYD'S policy.

14        30.    On or about September 27, 2019, Dr. Spoonamore wrote a letter

15   confirming Plaintiff's total and permanent disability.  Dr. Spoonamore wrote:

16             I do believe my patient, Dr. Gwartz, has medically necessary physical

17             restrictions and limitations as a result of his impairments. He has severe

18             discogenic disease in the thoracic and lumbar spine with stenosis and

19             radiculopathy. He also has undergone a recent thoracic surgery for a

20             tumor removal on 6/7/2019. Although some of the terrible pain and

21             dysfunction is simply postsurgical, a significant portion of this was present

22             prior to his surgery which do not think will improve over time and will likely

23             worsen. There is a high probability that he will require additional thoracic

24             and/or lumbar spinal fusion/reconstruction surgery in the future (5-10

25             years, maybe sooner).

26             Dr. Gwartz is functional to the extent he can care for himself and do basic

27             non-laborious activities and perform ADLS (activities of daily living).

28             However, I do not think he can do laborious activities like wear a lead

apron and perform injections under fluoroscopy. He can probably do some
amount of semi-sedentary work but I do not think he is capable of
performing his regular job as an interventional pain management
physician. He has significant daily pain and I am not confident he can
even do the lighter semi-sedentary activities of an office-only physician
since the high pain level affects his focus and concentration that is
required as a physician to be effective and competent.

31.     Plaintiff's disability is further complicated by cardiac abnormalities
documented by board-certified cardiologist, Leonardo Clavijo, M.D., including
hypertension exacerbated by chronic pain, borderline left ventricular hypertrophy,
dilated right and left atrium, and mitral and tricuspid regurgitation.

32.     On or about April 20, 2020, LLOYD'S contacted Plaintiff telephonically to
inform him for the first time that he is required to attend an Independent Medical
Examination.  LLOYD'S demanded Plaintiff attend this examination *in person*, despite
his high risk for COVID-19 due to his age and disabling medical conditions. At that time,
the State of California was under COVID-19 pandemic restrictions under which non-
emergency medical visits were not recommended for high-risk persons like Plaintiff.
Plaintiff informed LLOYD'S of his high-risk status, but LLOYD'S insisted he attend the
examination in person and repeatedly wrote to him in order to compel his attendance.

33.     On June 12, 2020, LLOYD'S wrote to Plaintiff reminding him of the
Independent Medical Examination it had scheduled and warning: "Failure of a claimant
to cooperate with Us in the administration of a claim may result in the termination of a
claim…" and "We, at Our expense, have the right to have the Insured examined by a
Physician of Our choice as often as reasonably necessary while a claim is pending."

34.     Despite his fear, anxiety and emotional distress, Plaintiff attended
LLOYD'S Independent Medical Examination in person on June 17, 2020.  Plaintiff
requested a copy of the Independent Medical Examination report thereafter.  To date,
LLOYD'S still refuses to produce the Independent Medical Examination report or pay

1     the Plaintiff's disability claim.

2         35.     Even though Plaintiff has been totally and permanently disabled under

3 the terms of the Policy since May 22, 2019, to date, LLOYD'S has unreasonably failed

4 and refused to pay him the disability benefits to which he is entitled.  Adding insult to

5 injury, LLOYD'S billed Plaintiff for $32,360.32 in additional premiums due on November

6 1, 2019, which are waived due to his disability according the terms of the Policy.

7 Plaintiff dutifully paid the amount LLOYD'S billed him, despite his loss of income from

8 his occupation due to total and permanent disability.

9

10         PLAINTIFF, BRIAN GWARTZ, M.D., FOR A FIRST CAUSE OF ACTION

11 AGAINST DEFENDANTS, THOSE CERTAIN UNDERWRITERS AT LLOYD'S

12 LONDON SUBSCRIBING TO POLICY NO. RCA43715082A-004; and DOES 1 through

13 10 inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING,

14 ALLEGES:

15         36.     Plaintiff refers to each and every paragraph of the General Allegations

16 and incorporates those paragraphs as though set forth in full in this cause of action.

17         37.     Defendants, and each of them, have breached their duty of good faith and

18 fair dealing owed to Plaintiff in the following respects:

19         a. Unreasonably failing to make disability payments to Plaintiff at a time when

20         Defendants knew that Plaintiff was entitled to the benefits under the terms of the

21         Policy.

22         b. Unreasonably delaying benefits to Plaintiff knowing Plaintiff's claim for benefits

23         under the policy to be valid.

24         c. Unreasonably withholding benefits from Plaintiff knowing Plaintiff's claim for

25         benefits under the policy to be valid.

26         d. Unreasonably misrepresenting to Plaintiff pertinent facts and insurance

27         Policy's provisions relating to the coverage in issue.

28         e. Failing to reasonably and promptly investigate and process Plaintiff's claims

DarrasLaw

1    for benefits.

2    f. Not attempting in good faith to effectuate a prompt, fair and equitable

3    settlement of Plaintiff's claims for benefits in which liability has become

4    reasonably clear.

5    g. Failing to promptly provide a reasonable explanation of the basis relied upon in

6    the Policy, in relation to the applicable facts, for the denial of Plaintiff's claims for

7    benefits.

8    h. Plaintiff is informed and believes and thereon alleges that Defendant has

9    breached its duty of good faith and fair dealing owed to Plaintiff by other acts or

10   omissions of which Plaintiff is presently unaware and which will be shown

11   according to proof at the time of trial.

12   38.    As a proximate result of the aforementioned unreasonable conduct of

13   Defendants, Plaintiff has suffered, and will continue to suffer in the future, damages

14   under the Policy, plus interest, and other economic and consequential damages, for a

15   total amount to be shown at the time of trial.

16   39.    As a further proximate result of the aforementioned unreasonable conduct

17   of Defendants, Plaintiff has suffered anxiety, worry, mental and emotional distress, all to

18   Plaintiff's general damage in a sum to be determined at the time of trial.

19   40.    As a further proximate result of the unreasonable conduct of Defendants,

20   Plaintiff was compelled to retain legal counsel to obtain the benefits due under the

21   Policy. Therefore, Defendants are liable to Plaintiff for those attorneys' fees, witness

22   fees and costs of litigation reasonably necessary and incurred by Plaintiff in order to

23   obtain the Policy's benefits in a sum to be determined at the time of trial.

24   41.    Defendants' conduct described herein was intended by Defendants to

25   cause injury to Plaintiff or was despicable conduct carried on by the Defendants with a

26   willful and conscious disregard of the rights of Plaintiff, or subjected Plaintiff to cruel and

27   unjust hardship in conscious disregard of Plaintiff's rights, or was an intentional

28   misrepresentation, deceit, or concealment of a material fact known to the Defendants

1   with the intention to deprive Plaintiff of property, legal rights or to otherwise cause injury,

2   such as to constitute malice, oppression or fraud under California Civil Code section

3   3294, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish

4   or set an example of Defendants.

5          42.   Defendants' conduct was highly reprehensible because: (1) it caused

6   Plaintiff not only substantial economic loss, but also physical injury and physical

7   sickness, including significant risk of death as a result of their insistence he attend an in-

8   person Independent Medical Examination during a global pandemic; (2) it demonstrated

9   Defendants' indifference and reckless disregard as to the health and safety of Plaintiff;

10  (3) it was repeated and continuous, rather than just an isolated incident; (4) it caused

11  harm to Plaintiff not by accident, but rather by Defendants' intentional malice, trickery,

12  and deceit; and (5) Plaintiff was financially vulnerable to Defendants' conduct.

13         43.   Defendants' conduct described herein was undertaken by the corporate

14  Defendant's deputies or managing agents, identified herein as DOES 1 through 10, who

15  were responsible for claims supervision and operations, underwriting, communications

16  and/or decisions. The aforedescribed conduct of said managing agents and individuals

17  was therefore undertaken on behalf of the corporate Defendants. Said corporate

18  Defendants further had advance knowledge of the actions and conduct of said

19  individuals whose actions and conduct were ratified, authorized, and approved by

20  managing agents whose precise identities are unknown to Plaintiff at this time and are

21  therefore identified and designated herein as DOES 1 through 10, inclusive.

22

23         PLAINTIFF, BRIAN GWARTZ, M.D., FOR A SECOND CAUSE OF ACTION

24  AGAINST DEFENDANTS, THOSE CERTAIN UNDERWRITERS AT LLOYD'S

25  LONDON SUBSCRIBING TO POLICY NO. RCA43715082A-004; and DOES 1 through

26  10 inclusive, FOR BREACH OF CONTRACT, ALLEGES:

27         44.   Plaintiff refers to each and every paragraph of the General Allegations and

28  First Cause of Action, and incorporates those paragraphs as though set forth in full in

1    this cause of action.

2         45.    Defendants, and each of them, owed duties and obligations to Plaintiff

3    under the Policy.

4         46.    Defendants, and each of them, breached the terms and provisions of the

5    insurance Policy by failing and refusing to provide benefits under the Policy as set forth

6    in the second paragraph of the First Cause of Action, incorporated herein by reference.

7         47.    As a direct and proximate result of Defendants' conduct and breach of

8    their contractual obligations, Plaintiff has suffered damages under the Policy in an

9    amount to be determined according to proof at the time of trial.

10

11        PLAINTIFF, BRIAN GWARTZ, M.D., FOR A THIRD CAUSE OF ACTION

12   AGAINST DEFENDANTS, THOSE CERTAIN UNDERWRITERS AT LLOYD'S

13   LONDON SUBSCRIBING TO POLICY NO. RCA43715082A-004; and DOES 1 through

14   10 inclusive, FOR FINANCIAL ELDER ABUSE, ALLEGES:

15        48.    Plaintiff refers to each and every paragraph of the General Allegations and

16   the First and Second Causes of Action, and incorporates those paragraphs as though

17   set forth in full in this cause of action.

18        49.    Plaintiff, whose date of birth is September 29, 1951, was over the age of

19   65 when he became totally disabled under the terms of the Policy, on or about May 22,

20   2019.  Defendants knew that the Plaintiff was a senior citizen based on his date of birth

21   noted in the claim forms and medical records.

22        50.    Defendants withheld Plaintiff's disability benefits, which he was legally

23   entitled to be paid under the Policy beginning on or about May 22, 2019.  Defendants'

24   conduct constitutes the retention of personal property of an elderly person, specifically

25   income replacement benefits that Plaintiff needed for medical expenses and living

26   expenses because he is unable to work. In so doing, Defendants caused a senior

27   citizen a loss of income necessary for personal or family care and maintenance, or

28   assets essential to the health or welfare of the senior citizen.

51.     Defendants knew or should have known that withholding these benefits would be harmful to Plaintiff, an elderly person, such as to constitute Financial Elder Abuse under California Welfare & Institutions Code section 15600 et seq.

52.     Plaintiff was substantially more vulnerable than other members of the public to the Defendants' conduct because of age and disability, and actually suffered emotional and economic damage resulting from the Defendants' conduct, thereby entitling Plaintiff to treble damages under California Civil Code section 3345.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

AS TO THE FIRST CAUSE OF ACTION AGAINST DEFENDANTS, THOSE CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO. RCA43715082A-004; and DOES 1 through 10 inclusive, FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING:

1.      Damages for failure to provide benefits under the Policy, plus interest, including prejudgment interest pursuant to section 10111.2 of the California Insurance Code, plus all other benefits to which he would be entitled while receiving disability benefits including, but not limited to, waiver of premiums paid for such benefits, and other economic and consequential damages, in a sum to be determined at the time of trial;

2.      General damages for mental and emotional distress in a sum to be determined at the time of trial;

3.      For attorneys' fees, witness fees and costs of litigation incurred by Plaintiff to obtain the Policy's benefits in an amount to be determined at the time of trial;

4.      Punitive and exemplary damages in an amount appropriate to punish or set an example of Defendants;

5.      For costs of suit incurred herein; and,

6.      For such other and further relief as the Court deems just and proper.

1    AS TO THE SECOND CAUSE OF ACTION AGAINST DEFENDANTS, THOSE

2  CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO.

3  RCA43715082A-004; and DOES 1 through 10 inclusive, FOR BREACH OF

4  CONTRACT:

5    1.    Damages under the Policy in an amount to be determined according to

6  proof at the time of trial;

7    2.    For costs of suit incurred herein; and,

8    3.    For such other and further relief as the Court deems just and proper.

9    AS TO THE THIRD CAUSE OF ACTION AGAINST DEFENDANTS, THOSE

10  CERTAIN UNDERWRITERS AT LLOYD'S LONDON SUBSCRIBING TO POLICY NO.

11  RCA43715082A-004; and DOES 1 through 10 inclusive, FOR FINANCIAL ELDER

12  ABUSE:

13    1.    Damages for wrongfully withheld benefits under the Policy, plus interest,

14  including prejudgment interest, plus all other benefits to which he would be entitled

15  while receiving disability benefits under the Policy, and other economic and

16  consequential damages, in a sum to be determined at the time of trial;

17    2.    For attorneys' fees, witness fees and costs of litigation;

18    3.    Punitive and exemplary damages in an amount appropriate to punish or

19  set an example of Defendants;

20    4.    Treble damages pursuant to California Civil Code section 3345;

21    5.    For costs of suit incurred herein; and,

22  / / /

23

24  / / /

25

26  / / /

27

28  / / /

COMPLAINT AND JURY DEMAND

6.    For such other and further relief as the Court deems just and proper.

Dated:  July 15, 2020

**DarrasLaw**

FRANK N. DARRAS
SUSAN B. GRABARSKY
PHILLIP S. BATHER
Attorneys for Plaintiff

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

Dated:  July 15, 2020

**DarrasLaw**

FRANK N. DARRAS
SUSAN B. GRABARSKY
PHILLIP S. BATHER
Attorneys for Plaintiff

COMPLAINT AND JURY DEMAND

# EXHIBIT A



# Individual Insurance Certificate

**Certificate Number:**  RCA43715082A-004

**Insured's Name:**  Brian Gwartz

**Owner's Name:**  Brian Gwartz

**Effective Date:**  November 01, 2015

Signed by Hanleigh Management, Inc., Lloyd's Correspondent
Issue Date: 12/28/2015

Graham Southall, Lead Underwriter

EXHIBIT "A"

1

## NOTICE:

1.   THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2.   THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3.   THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4.   THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5.   FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6.   FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF

EXHIBIT "A"

APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7.   CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8.   IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

D-2 (Effective July 21, 2011)

EXHIBIT "A"

# Individual Insurance Certificate



## This Certificate is attached to and forms part of certificate provisions

This is a legal contract between the Underwriters (We, Our, or Us), and the Owner (You or Your). This Certificate is issued in consideration of the attached Schedule, Application and other attached papers and the payment of the required Premium due.

### WHAT THIS CERTIFICATE PROVIDES

This Certificate provides Individual Disability Insurance coverage for loss due to Injury and/or Sickness. We will pay the benefits shown on the Benefit Schedule to the Beneficiary named in the Benefit Schedule after We receive satisfactory proof that the Insured has sustained a covered loss. Disability due to Sickness must result from a Sickness that first manifests itself while the Certificate is in force and causes Total Disability to commence within 365 days of a covered Sickness. Disability due to Injury must result from an injury which occurs while this Certificate is in force and causes Total Disability to begin within 365 days of a covered Accident. No dividends are payable. This insurance is subject to the terms, conditions, and limitations of this Certificate. Your applicable coverage is shown on the attached Schedule. Read Your Certificate carefully.

### RENEWAL PROVISION

This Certificate is not renewable. The Certificate is in force for the full Term for which the Premium has been paid, subject to Our limited right to terminate coverage as set forth in the provision entitled "When Your Coverage Ends".

### 10 DAY RIGHT TO EXAMINE CERTIFICATE

This Certificate can be returned for any reason within ten (10) days after You receive it.   You can return the Certificate by mail or in person to Us or to the agent who sold it. We will refund any Premium paid and treat the Certificate as if it were never issued.

### PRE-EXISTING CONDITION LIMITATION

This Certificate does not provide benefits for a loss due to a Pre-Existing Condition as defined in the Certificate unless: (1) the loss begins after the effective date of this Certificate and the insured has been symptom, treatment, and medications free for a continuous 12 month period; or (2) We have underwritten and agreed to cover such condition.

The Certificate is governed by the laws of the state of the Owner as listed on the schedule page.

---

Signed by Hanleigh Management, Inc.,  Lloyd's Correspondent

Hanleigh Management, Inc.
50 Tice Blvd. – Suite 122
Woodcliff Lake, New Jersey 07677

Graham Southall,  Lead Underwriter

**THIS CERTIFICATE IS NON-RENEWABLE.  PLEASE READ THE CERTIFICATE CAREFULLY.**

- 20 -                                                                    EXHIBIT "A"

## TABLE OF CONTENTS

| | Page |
|---|---|
| What This Certificate Provides | 1 |
| 10 Day Right to Examine Certificate | 1 |
| Pre-Existing Condition Limitation | 1 |
| Schedule | 3-4 |
| When Your Coverage Begins | 5 |
| When Your Coverage Ends | 5 |
| Premiums | 6 |
| Refunds | 6 |
| Definitions | 6-7 |
| Aggregate Limit | 7 |
| Exclusions | 8 |
| General Provisions | 9-10 |
| Inserts Attached | |

## SCHEDULE

The data entered below is subject to the applicable Provisions of the Certificate in accordance with the Benefit Coverage provided.

**Certificate:** RCA43715082A-004

**Premium Mode:** Annual

**Term:** Five Years Less One Day

**Termination Date:** October 31, 2020

**Effective Date:** November 01, 2015

**Name of Insured:** Brian Gwartz

**Occupation:** Physician - Anesthesiology

**Name of Owner:** Brian Gwartz
**Address:**        C/O Schweickert & Company
                    Peters Canyon Road
**City, State and Zip:** Irvine, CA  92606

**Name of Beneficiary:** Same

## BENEFIT SCHEDULE

Coverage is provided for the following benefits.  If no coverage is provided, the word  "No" will be checked, and  "NIL" will appear in the appropriate space.

**Total Disability for Accident & Sickness Benefit:**          ☐ Yes   ☒ No

| | |
|---|---|
| GSI Monthly Benefit | NIL |
| Excess Monthly Benefit | NIL |
| Benefit Period | NIL |
| Elimination Period | NIL |
| Term of Insurance | NIL |

**Residual Disability Benefit:**          ☐ Yes   ☒ No
(only available if Total Disability Benefit is selected)

**Permanent Total Disability for Accident & Sickness Benefit:**          ☒ Yes   ☐ No

| | |
|---|---|
| GSI Lump Sum | $3,000,000 |
| Excess Lump Sum | NIL |
| Elimination Period | 12 Months |
| Term of Insurance | Five Years Less One Day |

**Accidental Death Benefit:**          ☐ Yes   ☒ No

| | |
|---|---|
| Principal Sum | NIL |

**Accidental Death and Dismemberment Benefit:**          ☐ Yes   ☒ No

| | |
|---|---|
| Principal Sum | NIL |

**Aggregate Limit:**          $3,000,000

**Exclusions Deleted:** Refer to Policy

**Pre-existing Conditions Covered:** Refer to Policy

**Forms Attached at Issuance:** Amendment Rider, CA Notice Form D2, LL-AH-12994, Lloyd's Security, LL-AH-12978, GSI Elig. Rider, LSW1135b, Application

## PREMIUM SCHEDULE

| Premium Due Dates | 11/01/2015 | 11/01/2016 | 11/01/2017 | 11/01/2018 | 11/01/2019 |
|---|---|---|---|---|---|
| Premium | $31,260.00 | $31,260.00 | $31,260.00 | $31,260.00 | $31,260.00 |
| Certificate Fee | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 |
| CA Surplus Lines Tax | $937.80 | $937.80 | $937.80 | $937.80 | $937.80 |
| Stamping Fee | $62.52 | $62.52 | $62.52 | $62.52 | $62.52 |
| | | | | | |
| Total | $32,360.32 | $32,360.32 | $32,360.32 | $32,360.32 | $32,360.32 |

Surplus Lines Taxes to be filed by Hanleigh Management, Inc.  Woodcliff Lake, NJ

## PREMIUM PROVISIONS

The following provisions are provided for Annual and Installment premiums only.  Premium must be paid on or before the Premium Due Dates shown above, and are not subject to change.

**Grace Period:**  After the first Premium is paid, We will allow a Grace Period of 31 days for the payment of each subsequent Premium amount due.  During the Grace Period this Certificate will stay in force.

**Unpaid Premium:**  Upon the payment of a claim under this Certificate, any Premium due and unpaid will be deducted from such benefit payment.

**Waiver of Premium:**  In the event the Insured qualifies for benefits under this policy, any premium installments due while the Insured is disabled and receiving benefits will be waived.  Furthermore, if the Insured qualifies for benefits under this policy and subsequently returns to his or her occupation, any premium installments which are due within the ninety (90) day period following the Insured's return to his or her occupation will also be waived.  Any premium installments which are due after the Insured has returned to his or her occupation for ninety (90) days will be due and payable.

## SECURITY

**Security:**  Insurance is effective with Certain Underwriters at Lloyd's of London

**Several Liability Notice (LL-LSW1001 Insurance):** The subscribing insurers' obligations under contracts of insurance to which they subscribe are several and not joint and are limited solely to the extent of their individual subscriptions.  The subscribing insurers are not responsible for the subscription of any co-subscribing insurer who for any reason does not satisfy all or part of its obligations.

**Applicable Law (USA) (LMA5021):** This Insurance shall be subject to the applicable state law to be determined by the court of competent jurisdiction as determined by the provisions of the Service of Suit Clause (U.S.A.).

## SERVICE OF SUIT (LL-LMA5020)

This Service of Suit Clause will not be read to conflict with or override the obligations of the parties to arbitrate their disputes as provided for in any Arbitration provision within this Policy.  This Clause is intended as an aid to compelling arbitration or enforcing such arbitration or arbitral award, not as an alternative to such Arbitration provision for resolving disputes arising out of this contract of insurance (or reinsurance).

It is agreed that in the event of the failure of the Underwriters hereon to pay any amount claimed to be due hereunder, the Underwriters hereon, at the request of the Insured (or Reinsured), will submit to the jurisdiction of a Court of competent jurisdiction within the United States.  Nothing in this Clause constitutes or should be understood to constitute a waiver of Underwriters' rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or of any State in the United States.

It is further agreed that service of process in such suit may be made upon

MENDES & MOUNT
750 South Figueroa Street
Los Angeles, California 90017
U S A

and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or of any Appellate Court in the event of an appeal.

The above-named are authorized and directed to accept service of process on behalf of Underwriters in any such suit and/or upon the request of the Insured (or Reinsured) to give a written undertaking to the Insured (or Reinsured) that they will enter a general appearance upon Underwriters' behalf in the event such a suit shall be instituted.

Further, pursuant to any statute of any state, territory or district of the United States which makes provision therefor, Underwriters hereon hereby designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured (or Reinsured) or any beneficiary hereunder arising out of this contract of insurance (or reinsurance), and hereby designate the above-named as the person to whom the said officer is authorized to mail such process or a true copy thereof.

## WHEN YOUR COVERAGE BEGINS

All periods of insurance begin and end at 12:01 a.m. Local Standard Time, at the Owner's address as last shown on Our records.  The Insured's coverage will be in force upon completion of both of the following: (1) Our receipt of the Insured's Premium; and (2) Our approval at Our Administrative Offices of the Insured's signed Application and any other forms or attachments that We request the Insured to sign or that We may require for Our approval.  The Effective Date of coverage is shown on the attached Schedule.

## WHEN YOUR COVERAGE ENDS

Coverage will end when one of the following occurs: (1) the date the Insured dies; (2) the date the Aggregate Limit, as defined in this Certificate, is reached; (3) the date You request to end coverage; (4) on the Termination Date shown in the Schedule; (5) at the end of the period for which Premium is paid;  (6) the date Insured terminates employment {or contract} and (7) the date insurable interest between the Owner and the Insured ceases to exist (if applicable).

## PORTABILITY OPTION

At the option of the Insured, protection provided by this policy (certificate) may continue if the insured leaves employment of the owner /plan sponsor provided he/she remains actively employed in their insured profession and continues payment of premium payments for the remainder of the policy period. At the end of the policy period any ongoing coverage will be subject to individual underwriting at terms and conditions applicable to age, health and occupation at that time.

Should the Insured leave service of the owner / plan sponsor and not be immediately actively employed in his /her insured profession, protection provided by this policy (certificate) may be continued for the 90 days immediately following their departure from the owner / plan sponsor upon request by the Insured to Underwriters and upon payment of premiums by the insured for the period of 90 days. Any claim for benefits by the insured while not actively at work in their insured profession are not guaranteed and are subject to Underwriters review and approval.

## PREMIUMS/REFUNDS

The Premium due must be paid in full before coverage will start.  The Premium due is shown on the Schedule.  If the required Premium is not paid, the Certificate will not take effect.  Certificates issued greater than 12 months, if the Certificate is terminated before the Termination Date shown on the Schedule, we will provide a refund of any unearned Premium paid, less Certificate Fee.  For Certificates issued less than 12 months, premium is fully earned at inception and will not be refunded.

**Small Additional or Return Premiums (LL-NMA1168):** Notwithstanding anything to the contrary contained herein and in consideration of the premium for which this Insurance is written, it is understood and agreed that whenever an additional or return premium of $2 or less becomes due from or to the Assured on account of the adjustment of a deposit premium, or of an alteration in coverage or rate during the term or for any other reason, the collection of such premium from the Assured will be waived or the return of such premium to the Assured will not be made, as the case may be.

## CANCELLATION (LL-NMA 1331(Amended)) – Rev 01/21/2013

Notwithstanding anything contained in this Insurance to the contrary this Insurance may be cancelled by the Assured at any time by written notice or by surrendering of this Contract of Insurance.  This Insurance may also be cancelled by or on behalf of the Underwriters by delivering to the Assured or by mailing to the Assured, electronically, by registered, certified or other first class mail, at the Assured's address as shown in this Insurance, written notice stating when, not less than the longer of Ten Days or number of days as filing state statute provides, thereafter, the cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice and this Insurance shall terminate at the date and hour specified in such notice. Notice of Cancellation by the Underwriters shall be given only for non-payment of premium, fraudulent misrepresentation by the Insured, intentional non-disclosure of information which might have caused the Underwriters to impose special terms or the Insured having committed a criminal or felonious act.

If this Insurance shall be cancelled by the Assured the Underwriters shall retain the customary short rate proportion of the premium hereon, except that if this Insurance is on an adjustable basis the Underwriters shall receive the Earned Premium hereon or the customary short rate proportion of any Minimum Premium stipulated herein whichever is the greater.

If this Insurance shall be cancelled by or on behalf of the Underwriters the Underwriters shall retain the pro rata proportion of the premium hereon, except that if this Insurance is on an adjustable basis the Underwriters shall receive the Earned Premium hereon or the pro rata proportion of any Minimum Premium stipulated herein whichever is the greater.

Payment or tender of any Unearned Premium by the Underwriters shall not be a condition precedent to the effectiveness of Cancellation but such payment shall be made as soon as practicable.

If the period of limitation relating to the giving of notice is prohibited or made void by any law controlling the construction thereof, such period shall be deemed to be amended so as to be equal to the minimum period of limitation permitted by such law

## TRANSPLANT BENEFIT

If, after the Certificate has been in force for six (6) months, the Insured gives a part of his/her body to another person, the condition will be deemed a Sickness.   Disability benefits will be paid in the same way as for any other Sickness.

## PRESUMPTIVE DISABILITY

You will be presumed to be totally disabled, if due to accident or sickness while this coverage is in force, you have totally lost:  the use of both hands, or both feet, or one hand and one foot, or the sight of both eyes, or the hearing of both ears, or the ability to speak.  The Elimination Period will be waived.  Regular medical care is not required.  The covered monthly benefits will be paid as long as the loss exists, up to the Maximum Benefit Period.

## DEFINITIONS

**ACCIDENT** means a sudden, unexpected event that results in Injury to an Insured.  To be covered under the Certificate, an Accident must occur while coverage is in force for an Insured and must result in a loss or Injury covered by the Certificate for which benefits are payable.

**AGGREGATE LIMIT** means the combined maximum amount of benefits payable under all sections of this Certificate and shall not exceed the Aggregate Limit stated on the schedule.

## DEFINITIONS (cont'd)

**COMPLICATIONS OF PREGNANCY** means: (1) conditions requiring hospital stays (when the pregnancy is not terminated) whose diagnoses are distinct from pregnancy but are adversely affected by pregnancy or caused by pregnancy, such as acute nephritis, nephrosis, cardiac decompensation, missed abortion and similar medical and surgical conditions of comparable severity, and shall not include false labor, occasional spotting, physician-prescribed rest during the period of pregnancy, morning sickness, hyperemesis gravidarum, preeclampsia and similar conditions associated with the management of a difficult pregnancy not constituting a nosologically distinct complication of pregnancy; and (2) nonelective caesarean section, ectopic pregnancy that is terminated, and spontaneous termination of pregnancy, that occurs during a period of gestation in that a viable birth is not possible.

**ELIMINATION PERIOD** means the period of time shown on the Schedule during which the Insured must be continuously disabled before benefits may be payable.

**IMMEDIATE FAMILY** means a person who is related to the Insured in any of the following ways:  spouse; brother-in-law; sister-in-law; son-in-law; daughter-in-law; mother-in-law; father-in-law; parent (includes stepparent); brother or sister (includes stepbrother or stepsister); or child (includes legally adopted stepchild).

**INJURY** means bodily injury.  It must be caused by an Accident occurring while the Certificate is in force.  It must be a direct result of an Accident, independent of all other causes and/or Pre-Existing Conditions.

**OWNER** if other than the Insured, means the person who applies for insurance on behalf of, and in conjunction with, the Insured.  The Owner will pay the required Premium.  A valid insurable obligation must exist between the Owner and the Insured, as evidenced by an executed contract or other documentation defining such insurable interest.

**PHYSICIAN** means a legally licensed practitioner of the healing arts acting within the scope of his or her license and not the Insured, a member of the Insured's Immediate Family or a person residing with the Insured.

**CERTIFICATE FEE** is an administrative charge for initiating and maintaining the Certificate; it is shown in the Certificate Schedule

**PRE-EXISTING CONDITION** means a sickness or accidental injury for which you:
- Received medical treatment, consultation, care or services;
- Took prescription medication or had medication prescribed; or
- Had symptoms or conditions that would cause a reasonably prudent person to seek diagnosis, care or treatment in the 12 months  before your insurance or any increase in the amount of insurance under this certificate takes effect.

We will not pay benefits, or increase in benefit amount due to an elected increase in the amount of your insurance for a disability that results from a Pre-existing Condition, if you have been actively at work for less than 12 consecutive months after the date your Disability insurance or the elected increase in the amount of such insurance takes effect under this certificate.

**SICKNESS** means any sickness, illness or disease that:  (1) (a) is diagnosed or treated by a Physician while this Certificate is in force; and (b) is not a Pre-Existing Condition as defined above; or (2) is a Pre-Existing Condition but: (a) is declared on the Application for this Certificate; and (b) is not excluded from coverage by name or specific description.  Sickness includes Complications of Pregnancy.

## AGGREGATE LIMIT

In no event will Our total liability for all benefits payable under the Certificate exceed the Aggregate Limit amount shown on the Schedule.

## EXCLUSIONS

This Certificate does not cover any loss caused by, in whole or in part, or as a result of:

1. The Insured being under the influence of narcotics or intoxicants, unless taken under the advice of a Physician other than yourself or a member of Your immediate family; or

2. Any psychosis, neurosis, or neuropsychiatric illness including, but not limited to, any emotional anxiety or depression illness for which any form of psychiatric or psychological therapy is indicated or received.

3. Normal Pregnancy

4. Suicide, attempted suicide or intentionally self-inflicted injury;

5. Travel or flight on or in (including getting in or out, on or off) any vehicle for aerial navigation, if:

   A. the vehicle is being used: (1) for test or experimental purposes; or (2) by or for any military authority (including aircraft flown by the U.S. Military Airlift Command (MAC) or a similar service of another country); or

   B. the Insured is: (1) serving as a pilot or crew member (or student taking a flying lesson); or (2) riding as a passenger in a vehicle without a valid airworthiness certificate;

6. The Insured's participation in a riot or civil insurrection; or service in the military of any nation (upon notice to Us of entrance into active military service), We will provide a pro-rata refund of Premium in accordance with the Refunds or Military Service section of this Certificate;

7. Committing or attempting to commit a felony.

8. Any losses directly or indirectly arising out of, contributed to or caused by, or resulting from or in connection with, any act of nuclear, chemical, biological terrorism (as defined below) regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

   For the purpose of this exclusion:

   "Nuclear, Chemical, Biological Terrorism" shall mean the use of any nuclear weapon or device or the emission, discharge, dispersal, release or escape of any solid, liquid or gaseous Chemical agent and/or Biological agent during the period of this insurance by any person or group(s) of persons, whether acting alone or on behalf of or in connection with any organization(s) or government(s), committed for political, religious, ideological or ethnic purposes or reasons including the intention to influence any government and/or to put the public, or any section of the public, in fear.

   "Chemical" agent shall mean any compound which, when suitably disseminated, produces incapacitating, damaging or lethal effects on people, animals, plants or material property.

   "Biological" agent shall mean any pathogenic (disease producing) micro-organism(s) and/or biologically produced toxin(s) (including genetically modified organisms and chemically synthesized toxins) which cause illness and/or death in humans, animals or plants.

   If the Underwriters allege that by reason of this exclusion any loss is not covered by this insurance, the burden of proving the contrary shall be upon the Insured.

9. Nuclear reaction, nuclear radiation or radioactive contamination.

## WAR AND TERRORISM

Unless specifically excluded elsewhere in this insurance this Certificate **covers** the Insured Persons against bodily injury or sickness caused by or attributable to war, invasion, acts of foreign enemies, hostilities or warlike operations (whether war be declared or not), civil war, rebellion, revolution, insurrection, civil commotion assuming the proportions of or amounting to an uprising, military or usurped power; or any act of terrorism provided that the Insured Person is not taking an active part therein.

## GENERAL PROVISIONS

**ENTIRE CONTRACT; CHANGES.**  This Certificate, including the Application, riders, endorsements and any attached papers, constitutes the entire contract between You and Us.  No change in this Certificate can be made until it is approved by an authorized officer of the Underwriter.  The approval must be noted on or attached to this Certificate.  No agent or other person has the authority to change this Certificate or waive any of its provisions.

**TIME LIMIT ON CERTAIN DEFENSES.**  After two (2) years from the Effective Date of applicable coverage, only fraudulent misstatements made in the Application may be used to void the Certificate or deny any claim for loss.  In the event of any contest, the Insured will be furnished a copy of the instrument in question.  No claim for loss incurred after 1 year from the Effective Date will be reduced or denied because a Sickness or physical condition not excluded by name or specific description before the date of loss existed before the Effective Date.

**NOTICE OF CLAIM.**  Written notice of claim must be given within sixty (60) days after a covered loss occurs or as soon thereafter as reasonably possible.  The notice must be given to Us or Our agent.  Notice should include Your name and the Certificate number.

**CLAIM FORMS.**  When We receive the notice of claim, We will send the Insured forms for filing proof of loss.  If these forms are not given to the Insured within fifteen (15) days, he or she may meet the proof of loss requirements by giving Us a written statement of the nature and extent of the loss within the time limit stated in the Proofs of Loss section of this Certificate.

**PROOFS OF LOSS.**  Written proof of loss must be given within ninety (90) days after such loss. If it is not reasonably possible to give written proof in the time required, We will not reduce or deny the claim for this reason if the proof is filed as soon as reasonably possible.  In any event, the proof required must be given no later than one (1) year from the date of loss unless the claimant was legally incapacitated.  From time to time, We will require the Insured to provide continued proof of loss, satisfactory to Us, for benefits to continue to be payable.

**TIME OF PAYMENT OF CLAIM.**  All benefits payable under this Certificate for any loss will be paid in accordance with the Schedule upon receipt of due written proof of loss.

**PAYMENT OF CLAIMS.**  We will pay the Owner of this Certificate any benefits due unless a Beneficiary other than the Owner has been properly designated to receive such proceeds.

**CLAIMANT COOPERATION PROVISION.**  Failure of a claimant to cooperate with Us in the administration of a claim may result in the termination of a claim.  Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due.

**RECOVERY OF OVERPAYMENT.**  If benefits are overpaid, or paid in error, We have the right to recover the amount overpaid, or paid in error, by any or all of the following methods:

1.  A request for lump sum payment of the amount overpaid, or paid in error.
2.  Reduction of any proceeds payable under the Certificate by the amount overpaid, or paid in error.
3.  Any other legal means.

**LEGAL ACTION.**  No legal action may be brought to recover on this Certificate within sixty (60) days after written proof of loss has been given as required by this Certificate.  No such action may be brought after three (3) years from the time written proof of loss is required to be given.  For purposes of this provision, proof of loss means the initial proof required for payment of a claim.

**MISSTATEMENT OF AGE.**  If the age of the Insured has been misstated, We will pay the amount of benefit that the Premium paid would have purchased at the true age.

**ASSIGNMENT.**  This Certificate may be assigned.  We are not bound by any Assignment until received by and approved by Us on a form acceptable to Us.  We assume no responsibility or liability for the validity of any Assignment.

**GENERAL PROVISIONS (cont'd)**

**CHANGE OF OCCUPATION.** If the Insured is Injured or contracts a Sickness after having changed his/her occupation to one classified by Us as more hazardous than that stated in the Application for this Certificate, We will pay only such portion of the benefit provided by this Certificate as the premium paid would have purchased at the rates and within the limits fixed by Us for the more hazardous occupation. However, benefits will not be payable and coverage will immediately terminate if: (1) the new occupational class under Our then current underwriting guidelines would not be acceptable to Us in accordance with Our then usual and customary underwriting practices for this Certificate; or (2) the Owner of the Certificate is not the Insured and such Change in Occupation negates the underlying insurable interest that existed when such Certificate was issued. If coverage is terminated, it will end on the date of such Change of Occupation.

If the Insured changes his/her occupation to one classified by Us as less hazardous than that stated in the Application for this Certificate, upon receipt of proof of such Change of Occupation, We will reduce the premium rate and will return the excess pro-rata unearned premium from the date of the Change of Occupation. However, if the Owner of the Certificate is not the Insured, and a Change of Occupation negates the insurable interest that existed when the Certificate was issued, coverage will be terminated on the date of such Change of Occupation.

For this Change of Occupation provision, the classification of occupational risk and the premium rates shall be those that were last filed by Us with the appropriate regulatory agency, if required, prior to the occurrence of the loss for which We are liable or prior to the date of the Change of Occupation in the state where the Insured resided at the time this Certificate was issued. If such filing was not required, then the classification of occupational risk and the premium rates shall be those last made effective by Us in such state prior to the occurrence of the loss or prior to date of Change of Occupation.

If coverage is terminated under this Change of Occupation provision, We will refund the excess pro-rata unearned premium from the date of the Change of Occupation.

**PHYSICAL EXAMINATION.** We, at Our expense, have the right to have the Insured examined by a Physician of Our choice as often as reasonably necessary while a claim is pending.

**CONFORMITY WITH STATE LAW.** Any provision of this Certificate that, on its Effective Date, is in conflict with the laws of the state of the Owner on that date, shall be deemed amended to conform to the minimum requirements of such laws.

**ARBITRATION CLAUSE:** As part of the proof of **Permanent Total Disability** there must be included a certification from a physician that the Insured Person has suffered **Permanent Total Disability** as defined in the Certificate. In the event that Underwriters determine that it has not been demonstrated the Insured Person is **Permanently Totally Disabled,** then the question of **Permanent Total Disability** will be subject to the approval of two independent referees.

One referee shall be an independent legally qualified physician* or surgeon, chosen by the Underwriters and the second referee shall be an independent expert of recognised standing in the occupation (as stated in the Schedule) of the Insured Person, and shall be chosen by the Assured.

The referees shall have the authority to decide solely whether the Insured Person's **Total Disability** is **Permanent** as defined in this Certificate. The referees are not to decide any other aspect concerning the validity of the claim. The decision of the two referees will be binding upon all parties.

In the event that the two referees fail to agree, then they will appoint an Umpire (determined and agreed to by both parties prior to commencement of the arbitration procedure) whose decision will be final and binding upon all parties.

Any physicians, medical advisors and/or use of referees and umpire shall be domiciled in the country where the certificate was issued.

Each party shall be responsible for their own respective costs, except for those incurred as a result of the involvement of the final umpire where additional costs shall be shared equally.

*Physician means a legally qualified physician or surgeon other than a physician or surgeon who is related to the Insured Person by blood or marriage.

# Benefit Coverage Insert



**CERTIFICATE NUMBER: RCA43715082A-004**

## PERMANENT TOTAL DISABILITY FOR ACCIDENT AND SICKNESS BENEFIT

We will pay the Permanent Total Disability Benefit shown on the Schedule for a periodic loss of income if:

1. The Insured becomes Permanently and Totally Disabled as defined below as a direct result of:

    (a) an Injury which occurs while this benefit is in force and causes Permanent Total Disability  due to the injury to begin within 365 days of a covered Accident; or
    (b) a Sickness which first manifests itself while this benefit is in force and causes Permanent Total Disability to commence within 365 days of a covered Sickness; and

2. The Insured satisfies the Elimination Period shown on the Schedule; and

3. The Insured is under the regular care of a Physician that is appropriate for the condition causing the disability.

**"PERMANENTLY AND TOTALLY DISABLED"** means, as a result of a covered Injury or Sickness, the Insured is permanently and totally unable to perform the substantial and material duties of his or her regular occupation as shown on the Schedule which first manifests itself while this benefit is in force and is not expected to recover for the remainder of his or her life.  The Insured must also be under the regular care of a Physician that is appropriate for the condition causing the disability.

No benefit will be paid prior to the completion of the Elimination Period.   In no event will We pay more than the Aggregate Limit shown in the Schedule.

This provision is subject to all Certificate Term, conditions and limitations.

# Rider #1



**CERTIFICATE NUMBER:** RCA43715082A-004

In event of a claim against this policy it will be necessary for the insured person to show that he/ she has satisfied the underwriting eligibility requirements which are the following:-

1. For a period of time commencing 180 days prior to risk attaching under this policy the insured person has been continuously at work on a full-time basis (30 or more hours per week) in the usual and customary manner performing the duties of his / her occupation and has not been homebound or admitted to a medical facility due to injury or sickness;

2. The insured person is not suffering from a pre-existing condition as defined in the policy (unless specifically approved and accepted by underwriters);

3. The insured person has not been in receipt of any form of disability benefit in the period of five (5) years preceding the date risk attached under this policy.

This rider takes effect on November 01, 2015 , 12:01 a.m. Local Standard Time at  Irvine, CA  and expires concurrently with the Certificate and is subject to all of the provisions, definitions, limitations and conditions of the Certificate not inconsistent herewith.

Signed by Hanleigh Management, Inc.,  Lloyd's Correspondent

Graham Southall,  Lead Underwriter



# Amendment # 1

**CERTIFICATE NUMBER:** RCA43715082A-004

It is hereby agreed and acknowledged that the application and/or exam attached hereto and forming part of the above numbered certificate is amended as follows:

Sum Insured not to exceed 10 times annual earned income

This rider takes effect on 11/1/2015 , 12:01 a.m. Local Standard Time at  Irvine, CA       , and expires concurrently with the Certificate and is subject to all of the provisions, definitions, limitations and conditions of the Certificate not inconsistent herewith.

Signed by Hanleigh Management, Inc.,  Lloyd's Correspondent

Graham Southall,  Lead Underwriter



# Lloyd's Security

**CERTIFICATE NUMBER:** RCA43715082A-004

Underwritten by certain Underwriters at Lloyd's